UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                            Case No. 14-20276

DWAYNE LYDELL WILLIAMS,

    Defendant.
                                            /

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND DISMISS INDICTMENT**

On May 13, 2014, a grand jury returned a one-count indictment charging Defendant Dwayne Lydell Williams with a violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm. Pending before the court is Williams's Motion to Suppress Evidence and Dismiss Indictment (Dkt. # 21) filed on November 25, 2014. A hearing was held on April 24, 2015. For the reasons stated on the record and below, Williams's motion will be denied.

**I. STANDARD**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective

level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997) (citations omitted). At issue here are the first two types of encounters.

## A. Consensual Encounter

Consensual encounters with citizens by police officers are permitted without being in violation of the Fourth Amendment prohibitions on searches and seizures. *Florida v. Bostick*, 501 U.S. 429 (1991). A consensual encounter "may be initiated without any objective level of suspicion." *United States v. Waldon*, 206 F.3d 597 (6th Cir. 2000). An encounter is not consensual, and thus a seizure, if "a reasonable person would have believed that he . . . was not free to walk away." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir.2004). It is the government's burden to establish the interaction was consensual. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Whether a reasonable person would have believe he was free to leave is an objective inquiry. *United States v. Drayton*, 536 U.S. 194, 202 (2002). "Voluntariness is determined by examining the totality of the circumstances." *United States v. Beauchamp*, 659 F.3d 560, 571–72 (6th Cir. 2011).

"[A] reasonable person may not feel free to leave in the face of coercive police behavior, including: 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be

compelled.'" *United States v. Preston*, 579 F. App'x 495, 499 (6th Cir. 2014) (quoting *United States v. Jones*, 562 F.3d 768, 772 (6th Cir.2009)).

When officers use their marked patrol vehicle to block a citizen's vehicle from exiting a parking space, the encounter is not consensual. *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011); see also *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). On the other hand, when police officers block a citizen's vehicle in the driveway, but that citizen is not in the vehicle and able to walk away, the encounter may be consensual. *O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011).

### B. *Terry* Stop

Officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." *United States v. Mays*, 643 F.3d 537, 541 (6th Cir. 2011) quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion requires "more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). Reasonable suspicion must be considered under the totality of the circumstances, considering all of the information available to law enforcement officials at the time. Officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

"Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466

(6th Cir. 2006); *see also United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (holding that a furtive movement consistent with an attempt to conceal a firearm can support reasonable suspicion). However, the furtive conduct must be objective and particularized. *Id.* at 467.

## II. DISCUSSION

### A. Findings

The court held a hearing on Williams's Motion to Suppress on April 24, 2015, at which the court heard testimony from Officers Kline, Wilson, and Alam. The court also heard testimony from the Defendant and Nicole Crosby.

On April 16, 2014 at roughly 5:00 PM, Defendant Dwayne Lydell Williams was walking East on the North side of McNichols Rd., approaching Monica. (Dkt. # 27, Pg. ID 104, 160, 185.) The officers were driving a marked black Crown Victoria scout car with "Detroit Police" written on the sides, and lights on the inside front windows, rear windows and on each of the passenger mirrors. (*Id.* at 102, 159.) Officer Kline was driving the vehicle with Officer Wilson in the front passenger seat and Officer Alam sitting directly behind the driver. (*Id.* at 137, 153, 183.) The officers were wearing a "modified uniform" that consisted of green pants, a black polo, a bullet proof vest with "Police" written on the front and a badge displayed clearly in the middle of the chest. (*Id.* at .146, 151, 157, 183.) Officer Alam carried a drop holster, meaning that his gun was down on his right thigh. (*Id.* at 176, 185.)

Defendant wore a long brown coat. This is significant because the heavy coat on this nice day seemed suspicious to the officers. (*Id.* at 113, 139, 165.) Defendant carried a cell phone in his right hand. When he saw the scout car, he immediately

switched the cell phone to his left hand and used his right hand to tap his waist. (*Id.* at 104, 160, 161, 186.) Officer Alam named this motion a "hip check." (*Id.* at 186.) Officer Wilson called this a "weapons check." (*Id.* at 161, 180.) Officer Kline referred to this movement as a "gun check." (*Id.* at 104.) Officer Alam stated that Defendant had a "bladed body," meaning that he turned his body as if he was trying to hide his hip. (*Id.* at 188.) Officer Alam also stated that he could see a bulge protruding from the Defendant's hip. (*Id.* at 193.) The court fully credits this testimony of the three Officers that they observed the Defendant feel for the presence of his gun. Each Officer used differing terminology, "gun check," "hip check," and "weapons check," but the descriptions all matched. The Defendant testified that he "never . . . switched [his] cell phone or patted [his] hip." (Dkt. # 27, Pg. ID 207.) However, this testimony is consistent with the Defendant performing this action subconsciously. The court finds that Williams performed the weapons check.

As the officers turned onto Monica, Defendant slowed down pace and turned his right side away from the officers, furthering the notion that he was carrying a weapon. (*Id.* at 108, 127, 162, 188.) Officers Alam and Kline believed that they did not block Defendant's path from continuing down the sidewalk. (*Id.* at 134, 149, 188.) Conversely, Officer Wilson testified that Defendant would not have been able to keep walking in a straight line eastbound on McNichols Road across Monica Street because the scout car was blocking his direct path to the sidewalk. (*Id.* at 162.)

As Defendant approached the squad car, with a scared look on his face, Wilson exited the vehicle and asked Defendant if he had a license for his weapon, to which Defendant responded "no," while "he put his head down and looked at the ground." (*Id.*

5

at 110, 140, 154, 163, 180, 189.)[1]  At this point, it had become apparent to the officers that Defendant was likely armed.  (*Id.* at 110.)  Within about two seconds, Officer Alam opened the door and put Defendant's arms behind his back.  (*Id.* at 164, 189.)  Officer Alam states that he believes that he took Defendant's phone and placed it into one of his pockets.  (*Id.* at 191.)  The other officers are unsure as to what happened with the phone.  (*Id.* at 142, 165.)

Officer Wilson conducted a pat-down of the outside of Defendant's coat.  (*Id.* at 174.)  Upon feeling the weapon, Officer Wilson opened the coat to remove the fire arm from the holster on Defendant's right side.  (*Id.* at 110, 111, 115, 137, 164, 190.)  The gun retrieved was a Taurus 9 millimeter slim loaded with seven live rounds in a holster on the right side of Defendant's body.  (*Id.* at 115, 165, 200.)  Officer Alam then advised Defendant that he was under arrest for carrying a gun without a license, handcuffed him and put him in the back seat of the scout car.  (*Id.* at 190.)  Officer Wilson stated that Officer Alam handcuffed Defendant only after Officer Wilson patted Defendant down.  (*Id.* at 174.)  Although Officer Wilson testified that he did not recall if Defendant was asked if he was carrying a fire arm (*Id.* at 163),  Officer Kline stated that Defendant admitted to Officer Wilson that he was armed, (*Id.* at 147).  Defendant was then

---

[1]Defendant agrees that Officer Wilson asked him if he had a license for "that gun" or "that firearm."  (*Id.* at 211–12.)  However, he denies answering the question, stating that he didn't "know what made [him] not say anything."  (*Id.* at 211.)  The court finds incredible Williams's testimony that Officer Wilson asked the question, a fact which is not in dispute, but then immediately searched Williams without any response or follow up questioning.  The court fully credits the Officers' testimony, consistent with the contemporaneous incident report,  that Williams responded to the question by dropping his head and stating, "no," a physical acknowledgment of complicty or regret.

6

conveyed to the Detroit Detention Center where Officer Wilson authored a police department log on behalf of his team. (*Id.* at 143, 146.) According to Officer Wilson, Defendant's clothing was put wherever the Michigan Department of Corrections places property for storage while being held in custody. (*Id.* at 168.)

### B. The Search Was Permissible

Considering the totality of the circumstances, the court finds that the Officers had reasonable suspicion to conduct a *Terry* pat down of Williams. The valid pat down[2] led to discovery of the weapon, therefore the search was constitutionally sound. Defendant's physical weapons check upon seeing the scout car provided the main basis for reasonable suspicion. Additional factors include the undisputed high crime nature of the neighborhood, as well as the fact that Williams walked towards the officers with a bladed body, attempting to conceal the weapon. The bladed body, in particular, is "a maneuver . . . officers are taught as a way to protect their sidearms from assailants." *United States v. Johnson*, 336 F. App'x 554, 555 (6th Cir. 2009); *see also United States v. Chandler*, 437 F. App'x 420, 424 (6th Cir. 2011) (quoting District Court's description of a bladed body "as an attempt to conceal something on [Defendant's] right side"). That fact that Williams bladed his body in response to the presence of officers raises the inference that Williams not only possessed a firearm, but that he needed to hide its existence from the officers because he did not possess a license for it. Furthermore, the officers described Williams's expression as "nervous." Williams himself admitted to being nervous. (Dkt. # 27, Pg. ID 209.)

---

[2]Defendant's contention that Officer Wilson retrieved the gun prior to conducting a *Terry* frisk is not supported by the credited testimony. (*See* Dkt. # 27, Pg. ID 174.)

Williams's demeanor when asked whether he had a permit for his firearm further bolsters the officers' conclusion. The officers reasonably considered this as well in thinking that defendant had essentially admitted that he was armed. *See, e.g.*, *Purvis v. Dugger*, 932 F.2d 1413 (11th Cir. 1991) (suspect's "body language" during admission of stabbing victim included "look[ing] downward with his eyes and appeared more relaxed as if unburdening himself and he shook his head saying, 'I killed her,' . . . ."); *see also* Richard Webster, *Body Language Quick & Easy* 16 (2014) ("Lowering the head can be a sign of tiredness, *submission, worry, defeat, loss or shame.*" (emphasis added)); Frank Losik, *Strive to Be Happy!* 230 (2007) ("In the animal kingdom, a lowered head or slumped shoulders are signs of submission and defeat.").

These factors are sufficient to allow reasonable officers, using their training and experience, to conclude that Williams was likely committing a crime, namely carrying a weapon without a license. Because reasonable suspicion existed prior to the officers exiting the vehicle and questioning Williams, the court need not determine whether the questioning was conducted during a voluntary encounter. The court did not consider Williams's confession that he did not have a license for his firearm

Defendant speculates that patting his hip could have had any number of innocent explanations. However, the officers were not required to rule out every possible plausible scenario whereby Williams would make such a gesture. Instead, they need only have determined that the circumstances contained the indicia of the commission of a crime. The officers properly considered the furtive motion in response to their presence as an element of their reasonable suspicion determination. *See Caruthers*,

8

458 F.3d at 466. Their suspicion was concrete and articulable, rising to a level beyond that of a mere hunch.

This case is distinguishable from *United States v. Davis*, 554 F. App'x 485 (6th Cir. 2014). In that case, the judge specifically "found the officers' testimony 'unconvincing,' 'speculative,' and incredible." *Id.* at 489. In the instant case, the court finds the officers' testimony to be convincing, consistent, concrete, and credible. In light of the divergent credibility findings, *Davis* is not a useful comparison.

### III. CONCLUSION

Because the discovery of the firearm was the result of a constitutional search, the there is no basis for suppression of evidence. Accordingly,

IT IS ORDERED that Defendant Dwayne Lydell Williams's Motion to Suppress Evidence and Dismiss Indictment (Dkt. # 21) is DENIED.

                                          s/ Robert H. Cleland
                                          ROBERT H. CLELAND
                                          UNITED STATES DISTRICT JUDGE

Dated: June 18, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 18, 2015, by electronic and/or ordinary mail.

                                          S/Lisa Wagner
                                          Case Manager and Deputy Clerk
                                          (313) 234-5522